No. 22-13283-A

In the

# United States Court of Appeals
## for the Eleventh Circuit

---

HARRY W. TOLLEY, JR.,

*Plaintiff-Appellant,*

v.

MERCER UNIVERSITY,

*Defendant-Appellee.*

---

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division
No. 1:20-cv-2453-VMC-RDC

---

**BRIEF OF APPELLEE**

---

Callie D. Bryan
William B. McDavid, Jr.
JONES CORK, LLP
435 Second Street, Suite 500
Macon, GA 31201
(478) 745-2821
*Counsel for Defendant-Appellee*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

COMES NOW Mercer University, Defendant-Appellee in the above-captioned action, and pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1 files its Certificate of Interested Persons and Corporate Disclosure Statement as follows:

The undersigned counsel of record for Mercer University certify that the following is a full, complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

- Brooks, J. Kyle (counsel for Appellant)

- Bryan, Callie D. (counsel for Appellee)

- Buckley Beal, LLP (counsel for Appellant)

- Calvert, Hon. Victoria Marie (U.S. District Judge for the Northern District of Georgia)

- Cannon, Hon. Regina D. (U.S. Magistrate Judge for the Northern District of Georgia)

- Hill, Canon B. (counsel for Appellee)

- Jones Cork, LLP (counsel for Appellee)

- McDavid, William B. (counsel for Appellee)

- Mercer University (Appellee)

- Mew, Thomas J. (counsel for Appellant)

- Tolley, Harry W. (Appellant)

- United Educators Insurance Company (liability insurer for Appellee)

Defendant-Appellee is a Georgia Nonprofit Corporation that is registered with the Georgia Secretary of State as a domestic nonprofit corporation under the business name, "The Corporation of Mercer University." No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ Callie D. Bryan
Callie D. Bryan
Ga. Bar. No. 221194
William B. McDavid, Jr.
Ga. Bar. No. 315114
JONES CORK, LLP
435 Second Street, Suite 500
Macon, GA 31201
(478) 745-2821
Counsel for Defendant-Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Appellee does not request oral argument in this case. The facts and legal arguments are adequately presented in the briefs and record.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ................C-1

Statement Regarding Oral Argument ........................................................ i

Table of Citations ........................................................................ iv

Statement of Jurisdiction ................................................................1

Statement of the Issues ..................................................................2

Statement of the Case ....................................................................4

    A. Statement of Facts ................................................................4

    B. Procedural History ...............................................................7

    C. Standard of Review ...............................................................10

Summary of Argument .....................................................................11

Argument and Citations to Authority .....................................................16

    A. Tolley has failed to produce evidence from which a reasonable jury could conclude that the Search Committee was aware of his race at the time it decided not to interview him. ..........................................................16

    B. Mercer proffered legitimate, non-discriminatory reasons for not hiring Tolley, and Tolley has not produced evidence that those reasons are unworthy of credence and that discrimination was the real reason...............21

    C. Tolley has failed to show a convincing mosaic of circumstantial evidence from which a reasonable jury could conclude he was discriminated against because of his race. ...........................................................26

    D. Tolley cannot show that race was a motivating factor in the Search Committee's decision not to interview him.................................28

    E. The ministerial exception bars Tolley's claims............................29

Conclusion ...................................................................................................31

Certificate of Compliance ..........................................................................33

Certificate of Service .................................................................................34

# TABLE OF CITATIONS

## Cases

*Boykins v. SEPTA*,
 722 F. App'x 148 (3d Cir. 2018)..................................................................19

*Carithers v. Mid-Continent Cas. Co.*,
 782 F.3d 1240 (11th Cir. 2015) .........................................................10

*Chapman v. AI Transp.*,
 229 F.3d 1012 (11th Cir. 2000) ..........................................................23

*Conlon v. InterVarsity Christian Fellowship*,
 777 F.3d 829 (6th Cir. 2015) ..............................................................30

*Cordoba v. Dillard's, Inc.*,
 419 F.3d 1169 (11th Cir. 2005) ........................................... 12, 17, 18

*Hamilton v. Southland Christian Sch., Inc.*,
 680 F.3d 1316 (11th Cir. 2012) .........................................................30

*Haves v. City of Miami*,
 52 F.3d 918 (11th Cir. 1995) ..............................................................10

*Hedberg v. Ind. Bell Tel. Co.*,
 47 F.3d 928 (7th Cir.1995) ................................................... 12, 17, 18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
 565 U.S. 171 (2012).............................................................. 15, 29, 31

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*,
 903 F.3d 113 (3d Cir. 2018) ...............................................................30

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
 140 S.Ct. 2049 (2020)...........................................................................9

*Smith v. Lockheed-Martin Corp.*,
 644 F.3d 1321 (11th Cir. 2011) ..........................................................26

*St. Mary's Honor Center v. Hicks*,
 509 U.S. 502 (1993)..............................................................................22

iv

*Thompson v. DeKalb Cnty., GA*,
    2021 WL 5356283 (11th Cir. Nov. 17, 2021) ....................................................26

*United States v. Campbell*,
    26 F.4th 860 (11th Cir. 2022) ...............................................................................30

*United States v. Durham*,
    795 F.3d 1329 (11th Cir. 2015) .............................................................................30

*United States v. Four Parcels of Real Prop.*,
    941 F.2d 1428 (11th Cir. 1991) ..................................................................... 10, 11

*Wright v. City of St. Petersburg*,
    833 F.3d 129 (11th Cir. 2016) ...............................................................................11

**Statutes**

28 U.S.C. § 1291 .........................................................................................................1

28 U.S.C. § 1331 .........................................................................................................1

42 U.S.C. § 2000e .......................................................................................................1

**Rules**

Fed. R. Civ. P. 56 .....................................................................................................10

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction of the case pursuant to 28 U.S.C. § 1331, as it arose under laws of the United States, specifically 42 U.S.C. § 2000e *et seq*. This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1291 because it is an appeal from a final judgment of the district court that dismissed all claims. This appeal is timely because the district court entered final judgment on August 25, 2022, and Appellant filed a notice of appeal on Monday, September 26, 2022.

## STATEMENT OF THE ISSUES

1. All three members of the Search Committee that decided not to interview Dr. Harry Tolley for a New Testament position at McAfee Theological Seminary testified they were not aware of his race during the selection process. A faculty member, Dr. Lloyd Allen, who was Caucasian, stated he "probably" told one member of the Search Committee that Tolley was Allen's cousin's step-niece's husband.

Is Allen's statement sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that the Search Committee was aware that Tolley was Caucasian?

2. The Search Committee rejected Tolley's application for several legitimate, non-discriminatory reasons, including that his application did not indicate involvement or interest in the church and that his lack of experience as a full-time professor was a red flag.

Can Tolley demonstrate that the reasons proffered by the Search Committee are unworthy of credence and that discrimination was the real reason the Search Committee decided not to interview him?

3. Can Tolley show a convincing mosaic of circumstantial evidence from which a reasonable jury could conclude that the Search Committee decided not to interview him because of his race?

2

4. Has Tolley produced sufficient evidence for a reasonable jury to conclude that his race was a motivating factor in the Search Committee's decision not to interview him?

5. Does the ministerial exception to Title VII liability apply to McAfee Theological Seminary's decision not to invite Tolley to interview for the New Testament professorship? If so, did Mercer waive the ministerial exception here?

## STATEMENT OF THE CASE

### A. Statement of Facts

Mercer University's McAfee School of Theology ("McAfee") was founded to prepare students for congregational ministry, and it continues to exist for that purpose. Doc. 54-6 at 87:10-88:10.[1] On September 20, 2018, McAfee announced an opening for a full-time professor of New Testament Studies ("the New Testament position"). Doc. 54-5 ¶ 8. The "qualifications" section of the job posting listed one required qualification—a Ph.D. in New Testament, Biblical Studies, or a related field—and four "desirable qualifications," including "a strong commitment to the church and bridging the gap between the academy and the church." Doc. 54-4 at 14. McAfee appointed a search committee composed of three of McAfee's faculty—Dr. Karen Massey, Dr. Dave Garber, and Dr. Nancy deClaisse-Walford—and McAfee's Dean, Dr. Greg DeLoach, as a nonvoting member *ex officio*. Doc. 54-6 at 24:13-20, 26:12-17.

Tolley applied for the New Testament position on October 18, 2018 and was one of 109 total candidates. Doc. 54-5 ¶ 16; Tolley's Response to Mercer's Statement of Material Facts, Doc. 61-2 ¶ 9. The Search Committee received the application materials in an electronic format, but the demographic information

---

[1] Citations are to district court docket numbers unless otherwise noted. Citations to depositions refer to page numbers on the CM/ECF headers, which sometimes differ from the page numbers produced by the deposition court reporter.

submitted to Mercer's electronic application system was not passed on to any members of the Search Committee. Report and Recommendation, Doc. 78 at 6.

The Search Committee decided to interview a shortlist of candidates at the November 2018 meeting of the Society of Biblical Literature. The Search Committee's list of interviewees contained fourteen of the 109 candidates. Doc. 54-6 at 52:17-53:4. Tolley was not selected for the shortlist. Nine of the fourteen who advanced to the interview round were Caucasian. Doc. 22-8 ¶¶ 15-16. By November 1, 2018, the Search Committee had a "pretty full" interview slate but discussed another meeting on November 13 to determine whether they could make any last-minute additions. Doc. 74-3 at 13-14. During email discussions about last-minute candidates, one member of the Search Committee, Walford, proposed adding a personal acquaintance to the list. *Id.* at 13. After another member suggested waiting on other invitations unless "someone spectacular" came through, Walford stated her acquaintance was "a white male . . . sigh!" *Id.* However, all three members of the Search Committee testified they did not know Tolley's race when they made their decision. Docs. 76-1 ¶ 4; 76-2 ¶ 4; 76-3 ¶ 4; 76-4 ¶ 4.

On November 16, 2018, Tolley reached out to Allen, a member of McAfeee's faculty who was not on the Search Committee, and had a phone conversation with him. (Tolley's wife had first met Allen at a funeral in Spring 2018; Allen was Tolley's wife's step-uncle's cousin. Tolley Dep., Doc. 54-5 at 55:6-59:22.) Tolley

testified that during that conversation, Allen voiced his personal opinion that being female and being a person of color was an advantage. Doc. 54-5 at 71:1-6.

Allen testified that sometime after that phone conversation, he had a "60-second conversation" with Garber, a member of the Search Committee, about Tolley's application. Doc. 54-10 at 52:8-10. Allen testified that during that conversation, he "probably" told Garber that Tolley was his cousin's niece's husband. *Id*. at 52:17-24. The record does not establish when Allen's and Garber's conversation took place, only that it was sometime after Tolley's November 16 conversation with Allen.

Members of the Search Committee interviewed thirteen of the fourteen members of the shortlist at the November 2018 meeting of the Society of Biblical Literature. Doc. 54-8 at 50:1-7. The Search Committee discussed those candidates and selected three finalists from the fourteen. Doc. 22-8 ¶ 17. Two of the three finalists were Caucasian. Doc. 54-6 at 66:7-68:8, 69:18-19. The three finalists were invited to visit the school, meet with members of the faculty, and provide a guest lecture to McAfee students. *Id*. ¶¶ 17-18. After the visits, the Search Committee recommended two of the three candidates to the faculty: Dr. Angela Parker, an African-American female, and Dr. Chris Holmes, a Caucasian male. Doc. 54-8 at 62:7-20. The full faculty voted overwhelmingly for Parker, though Walford and Massey voted for Holmes. *Id*. at 64:24-66:12; Doc. 22-8 ¶ 19; Doc. 54-7 at 64:16-

6

17. The Search Committee confirmed the faculty's selection of Parker, DeLoach recommended Parker to Mercer's President, and the President approved that recommendation. Doc. 54-6 at 90:6-16, 91:4-24.

Tolley's application materials did not stand out to the Search Committee, such that when Tolley brought this action against Mercer, the Search Committee had no independent recollection of his name or application materials. When asked why they would not have selected Tolley as one of the fourteen interviewees, members of the Search Committee testified that his application materials indicated he was not actively involved with a church, was more inclined towards history and archaeology than theology or hermeneutics, was not a member of the Society of Biblical Literature, and had only held previous positions as an adjunct, which the Committee considered a "red flag." Doc. 54-1 ¶ 32.

**B. Procedural History**

Tolley filed this action pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, alleging that Mercer decided not to hire him because of his race. After discovery, Mercer moved for summary judgment. Doc. 54. United States Magistrate Judge Regina D. Cannon recommended that the district court grant Mercer's motion. *See generally* Doc. 78.

That recommendation was based on two independent grounds. First, Mercer produced evidence that none of the members of the search committee were aware of

Tolley's race during the selection process. *Id*. at 19-20. The Magistrate Judge noted that the "lone piece of evidence" Tolley put forward on that issue was Allen's testimony that he "probably" mentioned to Garber his distant relationship to Tolley. *Id*. at 20. The Magistrate Judge found that Tolley's attempt to "stack[] possibility on probability" was too speculative to establish a genuine issue of material fact. *Id*. Further, there was no evidence that Garber repeated that conversation to Walford or Massey. *Id*. at 21. Because the Search Committee did not know Tolley's race, the Magistrate Judge concluded, those claims failed. *Id*.

Second, the Magistrate Judge noted that multiple members of the Search Committee testified that Parker, not Tolley, was the best candidate for the position. *Id*. at 21-22. That was for several reasons, including that Tolley demonstrated very little church involvement, no seminary teaching or training, little interest in interpreting or contextualizing biblical texts, and no prior full-time teaching experience. *Id*. Parker, by contrast, was an ordained minister with an academic focus on biblical interpretation. *Id*. The Magistrate Judge noted that those were legitimate, non-discriminatory reasons for hiring Parker, and Tolley was unable to show those reasons were unworthy of credence and that he was rejected because of his race. *Id*. at 24.

Tolley objected, arguing that Allen's probable mention to Garber of his distant relationship with Tolley was sufficient evidence that the Search Committee knew

Tolley's race; that the Magistrate Judge did not give sufficient attention to statements about race made by faculty at McAfee; that some candidates (not Tolley) included demographic information in their application materials; and that members of the Search Committee failed to retain their notes about the candidate search process, in violation of Mercer's document-retention policy. Doc. 82 at 1-9. He also argued that the testimony of the Search Committee that they were looking for someone focused on church and hermeneutics instead of history and archaeology was inconsistent with the job posting, which was more generic. *Id*. at 9-10. Tolley also argued the Magistrate Judge should have allowed a mixed-motive claim to proceed and should have found a genuine issue of material fact under a "convincing mosaic" theory. *Id*. at 13-15.

The district court found that even if Allen had told Garber about his distant relationship to Tolley, "inferring that Dr. Garber intuited Tolley's race from this limited information (and then that somehow imputed this intuition to the entire hiring committee (*contra* Objection at 4)) is simply a bridge too far to be considered 'reasonable.'" Doc. 85 at 4-5. Although it did not discuss the Magistrate Judge's additional grounds, the district court adopted the Recommendation.

Mercer also argued, for the first time in its reply brief, that the ministerial exception to Title VII and Section 1981 barred Tolley's claims. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049 (2020). Tolley argued Mercer

had waived that defense by not raising it earlier; Mercer argued the defense is not waivable. Docs. 77 at 3-7; 75 at 13. The Magistrate Judge declined to address the applicability of the ministerial exception because Tolley's claims fail on the merits. Doc. 78 at 14 n.9. The district court did not address the ministerial exception.

## C. Standard of Review

The Court reviews *de novo* a district court's grant of summary judgment. *Carithers v. Mid-Continent Cas. Co.*, 782 F.3d 1240, 1245 (11th Cir. 2015). A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (internal quotation marks and citations omitted).

"When the *nonmoving* party has the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *United States v. Four Parcels of Real Prop. In Greene & Tuscaloosa Ctys. In State of Ala.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991) (internal quotation marks, alteration marks, and

citations omitted). Alternatively, the moving party may support its motion with affirmative evidence demonstrating that the nonmoving party will be unable to prove its claims at trial. *Id*.

"If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Id*. at 1438 (citations omitted). "If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment." *Id*. (internal quotation marks and citations omitted).

Additionally, this Court may "affirm for any reason supported by the record, even if the district court did not rely on that reason." *Wright v. City of St. Petersburg*, 833 F.3d 1291, 1294 (11th Cir. 2016) (quotation marks omitted).

## SUMMARY OF ARGUMENT

1. The Search Committee could not have discriminated against Tolley for being white because it did not know that he was white. The undisputed evidence shows the members of the Search Committee did not receive any racially identifying information from Tolley's application materials. Moreover, each member of the Search Committee testified that he or she was unaware of Tolley's race during the decisionmaking process.

Tolley argues that on November 16, 2018, his wife's step-uncle's cousin, Allen, "probably" told Garber, a member of the Search Committee, of Allen's distant relation to Tolley. He then surmises that Garber may have assumed he was white and that Garber may have informed the other Search Committee members of the relation and that, if so, they may have assumed he was white, too.

"Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir.1995)). All members of the Search Committee testified they did not know Tolley's race. Although Tolley's counsel argues Garber *might have* assumed Tolley was white and might have told that to the other Search Committee members, the evidence shows Garber *did not* assume Tolley was white and did not tell that to the other Search Committee members. The Magistrate Judge correctly concluded that the Search Committee did not know Tolley's race when it decided not to interview him, and the district court correctly adopted that conclusion.

2. The Magistrate Judge also correctly concluded that Mercer had proffered several legitimate, non-discriminatory reasons for not advancing Tolley to the interview round and that Tolley failed to rebut those reasons. Mercer was looking for a candidate with a strong commitment to the church and for someone with an interest in interpreting biblical texts. Members of the Search Committee testified that

Tolley's application materials did not signal either of those traits. Docs. 54-7 at 85:7-87:11; 54-9 at 83:6-84:5. Massey also testified that if someone has been an adjunct at numerous places with no full-time teaching experience, "that raises flags, when you've only been invited to adjunct and nothing more." Doc. 54-7 at 87:12-17.

Tolley makes only two arguments on pretext: first, that he had a "robust research and publication agenda" and second, that he had a Ph.D. in New Testament, Religious Studies, or a related field. Appellant's Brief at 36-37. Both statements show he met the required qualifications per the job posting, but neither argument undermines the Search Committee's legitimate, non-discriminatory reasons for not hiring him. Tolley has failed to produce any evidence that the Search Committee's reasons for not hiring him are unworthy of credence.

3. Nor can Tolley show a convincing mosaic of circumstantial evidence. As noted in (1.) and (2.), above, the Search Committee was unaware of Tolley's race, and the uncontroverted evidence shows that Tolley's application failed to demonstrate qualities, such as a strong commitment to the church, that were important to the Search Committee. Further, nine of the fourteen candidates who were interviewed were Caucasian.

Tolley emphasizes two pieces of evidence in his convincing mosaic argument: first, that Mercer employees made comments about race, and second, that two members of the Search Committee destroyed their notes. Appellant's Brief at 18-19,

27, 31-32. As noted above, Walford did propose a potential late addition to the interview slate and then, after a second committee member suggested not adding him, Walford stated that "he is a white male . . . sigh!" Doc. 74-3 at 13. Walford made that statement in the context of proposing that particular candidate to advance to the interview round. *Id*. Further, she ended up voting for a white male finalist to fill the position. Doc. 54-8 at 66:10-12. As such, Tolley's interpretation of Walford's email comment does not reflect how she acted and voted as a member of the Search Committee. And again, the evidence shows she never knew Tolley's race.

As the Magistrate Judge noted, both Walford and Massey testified they disposed of their notes for legitimate reasons: Walford because she likely got rid of them when she cleaned her office at the end of the 2019-2020 academic year because she did not believe there was any reason to keep them, and Massey because she had taken notes on each candidate's résumé and believe that extra copies of applicants' résumés were supposed to be destroyed. Doc. 78 at 26-27. Tolley has not produced evidence to rebut those explanations.

4. Further, Tolley cannot show that race was a motivating factor in the Search Committee's decision not to interview him. The Search Committee was not aware of his race when it decided not to interview him, and Tolley has produced no evidence that race was a motivating factor. Moreover, other evidence—including Mercer's unrebutted legitimate, nondiscriminatory reasons and the fact that the

14

Committee advanced Caucasian individuals who were better fits for the position than Tolley—cuts off any speculation by Tolley that race was a motivating factor in the Search Committee's decision not to interview him.

5. The ministerial exception "precludes application of [Title VII and other employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012). McAfee is historically Baptist and exists to prepare ministers for congregational settings. Doc. 54-6 at 82:14-20, 87:4-88:10. The fact Parker was committed to the church and was Baptist was one of the reasons she was selected for the New Testament teaching position, and Tolley's lack of demonstrated interest in the church and in biblical interpretation is part of why he was not selected. The ministerial exception fits these facts. Mercer first raised the ministerial exception in its reply brief in support of its motion for summary judgment.

This Court has not ruled on whether the ministerial exception is waivable. However, the Third and Sixth Circuits have held it is a structural bar that is not waivable. Those courts have it right: the Establishment Clause operates as a limit on governmental intrusion into internal church governance and, consequently, cannot be waived. Accordingly, the ministerial exception bars Tolley's claims.

## ARGUMENT AND CITATIONS TO AUTHORITY

**A.  Tolley has failed to produce evidence from which a reasonable jury could conclude that the Search Committee was aware of his race at the time it decided not to interview him.**

The primary issue in this appeal is a straightforward one: Allen, who is Caucasian, "probably" told Garber sometime after November 16—more than two weeks after the Search Committee had scheduled most of the interviews for its shortlist—that Tolley was his cousin's step-niece's husband. Was that sufficient to give Garber notice that Tolley was Caucasian and, if so, could a jury assume that Garber had passed that information on to other members of the Search Committee?

A cousin's step-niece's husband is a highly attenuated relationship, and there is no reason to believe Garber would have assumed (1) that Allen's cousin's step-niece must be the same race as Allen or (2) that she must find a husband of the same race as her. That Tolley is married to Allen's cousin's step-niece would not have told Garber anything about Tolley's race.

Even if that assumption was a reasonable one—which it was not—what matters is whether Garber and the other members of the Search Committee *actually* made that assumption. The evidence shows they didn't: all testified they did not know Tolley's race. Docs. 76-1 ¶ 4; 76-2 ¶ 4; 76-3 ¶ 4; 76-4 ¶ 4. And nowhere has

16

Tolley produced any evidence that members of the Search Committee actually made the assumption that Tolley thinks they might have made. [2]

"Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir.1995)). The summary judgment procedure achieved that goal here: members of the Search Committee testified they did not know Tolley's race, and Tolley was unable to controvert that evidence. Instead, he has merely continued to speculate that they *might have* assumed. That is insufficient to defeat summary judgment.

This Court previously rejected a similar argument based on speculation. In *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169 (11th Cir. 2005), a former sales associate sued her employer, alleging wrongful termination based on disability. She argued her employer was aware of her disability because, after she had accumulated some unexcused absences and tardies, she told her supervisor that she had missed work for doctors' appointments and that the doctors could not determine why she was

---

[2] To the extent Tolley's argument is based on a crude assumption that people only marry people of the same race or are only related to people of the same race, it would be unfair to charge Garber, Walford, or Massey with that same crude assumption when they have expressly refuted that in their testimony. Further, the facts of this case undercut that crude assumption. Tolley's wife—Allen's cousin's step-niece, whom Allen first met at a funeral in early 2018—is Asian-American. Doc. 54-10 at 41:23-42:4.

feeling badly. 419 F.3d at 1180. This Court found that this evidence "fell far short of creating a genuine issue as to whether [her supervisor] was aware of her disability." *Id*. Further, although several other employees "were generally aware of [plaintiff's] condition[,]" this Court did not allow speculation about what they might or might not have told their supervisors to create a genuine issue of fact. *Id*. at 1181. This Court described plaintiff's argument as "pure conjecture," a description that is also apt in this case. *Id.*

In *Cordoba*, this Court also cited favorably to the similar case of *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). In *Hedberg*, the plaintiff told his supervisor that he had a "possible major health problem" but asked him not to tell anyone else. 47 F.3d at 930. The plaintiff's supervisor's supervisor, Knowling, later decided to discharge him. The plaintiff opposed defendant's summary judgment motion by arguing that his supervisor might have told Knowling about the medical condition, but the supervisor testified he did not tell Knowling about it. *Id*. at 930-31. The court held that in the face of that testimony, "[plaintiff's] desired inference, that [his supervisor] must have told Knowling of [plaintiff's] illness before [the decision to terminate him], is not reasonable; it is unsupported speculation." *Id*. at 931-32. Likewise, Tolley's speculation about what might have happened is insufficient to dispute the clear testimony of the Search Committee that they were unaware of his race at the time they made their decision.

In a case in the Third Circuit, a plaintiff applied for a promotion in September 2014, interviewed with a three-person panel including one McGovern, was not promoted, and filed an EEOC complaint. *Boykins v. SEPTA*, 722 F. App'x 148, 151 (3d Cir. 2018). He later applied for another position for which McGovern was the Hiring Manager, but the plaintiff was not selected for an interview. *Id*. at 155, 157. McGovern testified that he was not aware of the EEOC complaint when he denied plaintiff's interview request. *Id*. at 158. Plaintiff argued that his employer could not have investigated the EEOC complaint without informing McGovern about it—speculation that is more reasonable than Tolley's speculation in this case—but the Court rejected that argument, ruling that plaintiff's "unsupported inference that his departmental managers were notified" of the charge before they decided not to interview him was not sufficient to withstand summary judgment. *Id*.

Those cases illustrate that when a supervisor or hiring individual testifies that he or she was not aware of plaintiff's protected characteristic, speculation that that person might have been aware of the characteristic is insufficient to survive summary judgment.

There is at least one additional problem with Tolley's argument: chronology. To the extent that Tolley intends to use Allen's conversation with Garber as evidence the Search Committee knew Tolley's race, he must show that conversation took place before the Search Committee decided not to interview Tolley. Based on

19

Tolley's notes, his call with Allen occurred at 4:01 p.m. on Friday, November 16, 2018. Doc. 54-5 at 74:10-76:8; 63-1 at 24. Allen's conversation with Garber occurred sometime after that. Doc. 54-10 at 32:21-23.

The Search Committee, meanwhile, conducted interviews at the November 2018 meeting of the Society of Biblical Literature. Although the record does not contain the precise dates for the 2018 Society of Biblical Literature meeting, emails among the Search Committee members show that they already had a "pretty full" card for interviewees as of November 1, 2018—fifteen days before Tolley reached out to Allen—and that they were trying to schedule a meeting on November 12th or 13th for "last minute appointments." Doc. 74-3 at 13. Finally, the same emails suggest that the Search Committee was reviewing the applications as they came in. Tolley's application came in October 18, 2018. Doc. 54-5 ¶ 16. On October 31, Walford stated she had reviewed recent applications and none seemed "particularly compelling", and Garber suggested not issuing other invitations until after November 10 "unless someone spectacular comes through." Doc. 74-3 at 13. Those conversations occurred more than two weeks before Tolley spoke with Allen.

Tolley has produced no evidence that Allen's subsequent conversation with Garber—Tolley's sole purported evidence the Search Committee knew his race— occurred before the Search Committee decided not to interview him. To the contrary, the only available evidence that bears on that chronology—discussed above—

20

indicates the Search Committee likely reviewed Tolley's application and chose not to interview him well before Allen spoke to Garber.

In sum, the assumption that Allen's cousin's step-niece's husband must be the same race as Allen is a crude and highly attenuated assumption. Further, it is an assumption that Garber, by his own testimony, did not make. Tolley's speculation about what Garber might have assumed is just that—speculation—and courts have routinely rejected similar speculation where, as here, it is refuted by testimony. Tolley's already-weak speculation is further undercut by (1) timing, as there is no evidence that Allen's statement to Garber predated the Committee's decision not to interview Tolley, (2) that Allen's statement to Garber about a distant familial relation was only "probabl[e]", not definite, and (3) that there is no evidence Garber relayed that information to the other Search Committee members, and those members also testified they were unaware of Tolley's race. For those reasons, the district court's conclusion that Tolley failed to create a genuine issue of fact on the Search Committee's awareness of his race should be affirmed. As the district court noted, that alone dooms Tolley's claims.

**B.  Mercer proffered legitimate, non-discriminatory reasons for not hiring Tolley, and Tolley has not produced evidence that those reasons are unworthy of credence and that discrimination was the real reason.**

Tolley's claims fail for an additional reason: that he cannot rebut Mercer's reasons for not hiring him. To rebut a defendant's legitimate, non-discriminatory

reason for not hiring someone, the plaintiff must show the proffered reason is pretext for discrimination. That requires a showing "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). Tolley cannot make either of those showings.

McAfee was not looking for just any Religious Studies Ph.D., but for one whose interests and strengths made them a good fit for McAfee. In particular, McAfee was also looking for a candidate with "a strong commitment to the church and bridging the gap between the academy and the church." Docs. 54-8 at 105; 54-9 at 24:7-14. Tolley's résumé did not mention the church, let alone bridging the gap between the academy and the church. Docs. 63-1 at 8-19; 54-9 at 83:23-84:4. His cover letter professed that his "first love . . . is history" and noted, without any elaboration, that "History is the discipline that offers the best means by which to bridge the gap between the academy and the church." Doc. 63-1 at 15. He also noted, in extremely conclusory fashion, "I have a strong commitment to the Christian church and a great respect for people of faith regardless of tradition." *Id*. He did not elaborate any more on that, either. Tolley did provide detail about his historical research, but he never explained how any of that research related to the church or to Christian ministry. *Id*. at 8-19. The members of the search committee "were not looking for a historian" or an archaeologist, but most of Tolley's work was in history and archaeology, not biblical interpretation. Docs. 54-7 at 86:12-24; 54-9 at 83:23-

84:4. Further, his application materials did not demonstrate work in bridging the gap between the academy and the church. Doc. 54-9 at 83:23-84:4.

Massey also testified that if someone has been an adjunct at numerous places with no full-time teaching experience, "that raises flags, when you've only been invited to adjunct and nothing more." Doc. 54-7 at 87:12-17.

Tolley has not produced any evidence undermining those reasons for not hiring him. On appeal, he makes only two arguments to quibble with those reasons: first, that he satisfied the job description because he had a "robust research and publication agenda" and second, that he satisfied the job posting because he had a Ph.D. in Religious Studies with a primary specialization in Christian Origins/New Testament. Appellant's Brief at 36-37. However, that amounts merely to an argument that Tolley was *qualified*. The district court found that he was qualified, and Mercer does not argue otherwise for purposes of this appeal. But Tolley's arguments that he was qualified do not address the reasons put forward by Mercer for not hiring him.

After an employer proffers a legitimate, non-discriminatory reason for not hiring a plaintiff, the plaintiff "must meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Far from meeting Mercer's proffered reasons head-on, Tolley has not addressed them at all.

Despite missing that critical step of his pretext burden, Tolley also tries to show pretext by arguing that Mercer deviated from its regular procedures during the hiring process. Appellant's Brief at 33-34. He argues that the applications "were supposed to be neutral in terms of demographic content" but were not because some applicants included references to race in their application, such as one candidate's statement in a cover letter that he was "a racial/ethnic minority." *Id*. at 34.

That argument mischaracterizes Mercer's regular procedures. Candace Whaley, an employee in Mercer's Human Resources department, testified that Human Resources retains demographic data collected from its online website separately from application materials, and that the separate demographic data are not passed on to the search committee. Doc. 54-5 ¶¶ 1-3, 18-20. Tolley has not produced any evidence that that practice was not followed here. Instead, he appears to fault Mercer's HR department for not combing through candidates' application documents and meticulously scrubbing every possible clue as to an applicant's race or gender. But that was never Mercer's standard practice.

Finally, Tolley argues that Walford and Massey threw away their notes about the search. As the Magistrate Judge noted, both Walford and Massey testified they threw out their notes for legitimate reasons: Walford because she likely got rid of them when she cleaned her office at the end of the 2019-2020 academic year because she did not believe there was any reason to keep them, and Massey because she had

taken notes on each candidate's résumé and believed that extra copies of the résumés were supposed to be destroyed. Doc. 78 at 26-27. Tolley has not produced evidence to rebut those explanations.

Tolley acknowledges the Magistrate Judge's conclusion that Walford and Massey destroyed their notes for non-nefarious reasons. Appellant's Brief at 35-36. Tolley's only response is a bootstrapping argument: that destroying notes for good-faith reasons *plus* deviation from Mercer's normal practices should create a fact-issue on pretext. *Id*. Tolley cites no authority to support that theory, and in any event, as discussed in in the above paragraph, Tolley has not shown any deviations from Mercer's normal practices.

In conclusion, Tolley failed to address Mercer's legitimate, non-discriminatory reasons for not hiring him. Further, his attempt to show deviations from Mercer's normal practices is unsupported by evidence, and the testimony by Walford and Massey that they destroyed their notes for non-nefarious reasons negates his attempt to use the loss of the notes to show pretext. For those reasons, Tolley failed to show that Mercer's legitimate, non-discriminatory reasons for not hiring him were pretext for race discrimination.

**C. Tolley has failed to show a convincing mosaic of circumstantial evidence from which a reasonable jury could conclude he was discriminated against because of his race.**

Recognizing that the *McDonnell Douglas* framework is not the *sine qua non* for surviving summary judgment, Tolley argues that he can produce a convincing mosaic of circumstantial evidence from which a reasonable jury could conclude he was discriminated against. Appellant's Brief at 38 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

"A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. A convincing mosaic may consist only of the plaintiff's prima facie case and of the evidence rebutting the employer's proffered reasons. The plaintiff carries the ultimate burden of providing sufficient evidence to yield a reasonable inference of the employer's discrimination." *Thompson v. DeKalb Cnty., GA*, 2021 WL 5356283, at *9 (11th Cir. Nov. 17, 2021) (quotation marks, citations, and alteration marks omitted).

Viewing the record as a whole, several key facts stand out: first, the members of the Search Committee testified they had no knowledge of Tolley's race when they decided not to interview him, and Tolley has produced no evidence to the contrary.

Second, Mercer proffered legitimate, non-discriminatory reasons for not hiring Tolley, and Tolley has not even attempted to rebut them. Third, of the fourteen candidates Mercer selected to interview, nine were Caucasian; of the three finalists, two were Caucasian. Fourth, two of the three members of the Search Committee who had passed on Tolley ultimately voted for the Caucasian male to fill the position.[3]

Against that backdrop, the evidence Tolley cites in support of his convincing mosaic theory does not establish a genuine issue of fact. He notes an episode when Walford proposed a candidate and then, after another member suggested waiting on other invitations, stated, "he is a white male . . . sigh!" Appellant's Brief at 28; Doc. 74-3 at 13. As discussed above, Walford did not know Tolley's race when she decided not to interview him, and she ended up voting for a white male for the position. That isolated comment does not show she harbored any discriminatory animus towards Tolley.

Second, Massey recalled that when the Search Committee was discussing Parker (long after declining to interview Tolley), they noted the enthusiastic response by students to her guest lecture, her seminary teaching experience, the fact she was a Baptist, and that their accrediting agency had reminded them to pay

---

[3] All three finalists' initial applications had demonstrated a much stronger interest in hermeneutics and in bridging the gap between the church and the academy than Tolley. Doc. 54-8 at 118-123, 150-163; 195-202.

attention to gender and racial diversity and that Parker brought that. Appellant's Brief at 28; Doc. 54-7 at 68:3-69:4. As Tolley notes in his brief, Greg DeLoach stated that "While we are appropriately directed to hire the best, all things being equal a person of color would be preferred." Doc. 74-3 at 31. Tolley does not cite authority that considering diversity as a potential tiebreaker is illegal. Nonetheless, these facts do not raise that issue: the Search Committee did not know the race of the applicants at the time it decided not to interview Tolley; it advanced candidates who fit the criteria better than Tolley, including Caucasian candidates, to the interview and finalist stages; and two members of the Search Committee ultimately voted for a Caucasian male for the position. Tolley was a poor fit for the position, and the evidence shows that race played no role in the decision not to invite him to interview. For that reason, he cannot show a convincing mosaic of circumstantial evidence that the Search Committee decided not to interview him because of his race.

**D. Tolley cannot show that race was a motivating factor in the Search Committee's decision not to interview him.**

Tolley also argues that a reasonable jury could find that race was a motivating factor in the Search Committee's decision not to interview him. Doc. 18 at 41. In support, he argues that he has "raised triable issues of fact concerning the search committee's awareness of his race[.]" Appellant's Brief at 41. As discussed above, however, Tolley did not produce evidence that the Search Committee was aware of his race. Even if he had produced such evidence, the uncontroverted evidence

discussed above—including that nine of fourteen candidates who advanced further than Tolley were Caucasian and that Tolley's application failed to satisfy key criteria of the Search Committee—shows that no reasonable jury could find by a preponderance of the evidence that Tolley's race was a motivating factor in the Search Committee's decision not to interview him.

**E.  The ministerial exception bars Tolley's claims.**

The "'ministerial exception,' grounded in the First Amendment . . . precludes application of [Title VII and other employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012). The ministerial exception is based on the principle that state interference with a religious organization's employment decisions both infringes the Free Exercise Clause, "which protects a religious group's right to shape its own faith and mission through its appointments," and the Establishment Clause, "which prohibits government involvement in such ecclesiastical decisions." *Id*. at 188-189. McAfee has always existed to prepare ministers for congregational settings, not to prepare academics for further study for a Ph.D. Doc. 54-6 at 87:4-88:10. McAfee is also historically Baptist, and the fact Parker was committed to the church and was Baptist was one of the reasons she was selected to teach the New Testament. Doc. 54-6 at 82:14-20. Conversely, Tolley's lack of demonstrated interest in the church,

in theology, and in biblical interpretation is part of why he was not selected. The ministerial exception clearly fits these facts, but Mercer first raised that defense in its reply brief below.

This Court has not ruled on whether the ministerial exception is waivable. However, the Third and Sixth Circuits have held that it is a structural bar that is not waivable. *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 & n.4 (3d Cir. 2018) ("the Church is not deemed to have waived it because the exception is rooted in constitutional limits on judicial authority.") (citations omitted); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015) ("The Court's clear language [in *Hosanna-Tabor*] recognizes that the Constitution does not permit private parties to waive the First Amendment's ministerial exception. This constitutional protection is not only a personal one; it is a structural one that categorically prohibits federal and state governments from becoming involved in religious leadership disputes.").[4]

_____

[4] Tolley's primary authority to the contrary is *Hamilton v. Southland Christian Sch., Inc.*, where this Court noted that defendant-appellee had waived the ministerial exception by not raising it in its initial brief despite arguing it to the district court. 680 F.3d 1316, 1319 (11th Cir. 2012), *overruled in part by United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015); Doc. 77 at 3-6. However, this Court has noted that "[w]aiver directly implicates the power of the parties to control the course of the litigation; if a party affirmatively and intentionally relinquishes an issue, then courts must respect that decision." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 95 (2022). Here, Mercer has not intentionally relinquished that issue, and this Court is not required to disregard the potential applicability of the ministerial exception.

The courts' reasoning is consistent with precedent: "[a]ccording the state the power to determine which individuals will minister to the faithful . . . violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S. at 188-89. The prohibition on governmental interference in church governance doesn't go away when a defendant fails to plead it in the Answer. Under the interference-with-church-governance rationale of *Hosanna-Tabor*, the Establishment Clause violation happens at the time the court interferes with the church governance decision. District courts should be allowed to refrain from such interference on their own initiative, even if a party has not raised the Establishment Clause issue or has raised it after its Answer. For those reasons, the Third and Sixth Circuits' holdings that the ministerial exception is not waivable accord with both *Hosanna-Tabor*'s rationale and the structural nature of the Establishment Clause. That provides an alternative basis for this Court to affirm the district court's ruling in favor of Mercer.

## CONCLUSION

For the reasons discussed above, Mercer respectfully requests that this Court affirm the district court's order granting Mercer's motion for summary judgment.

Respectfully submitted, this 24th day of April, 2023.

[signature block on following page]

31

<u>*/s/ Callie D. Bryan*</u>
Callie D. Bryan
Ga. Bar. No. 221194
William B. McDavid, Jr.
Ga. Bar. No. 315114
JONES CORK, LLP
435 Second Street, Suite 500
Macon, GA 31201
(478) 745-2821
*Counsel for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 7,434 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman type.

*/s/ Callie D. Bryan*
Callie D. Bryan
Ga. Bar. No. 221194
William B. McDavid, Jr.
Ga. Bar. No. 315114
JONES CORK, LLP
435 Second Street, Suite 500
Macon, GA 31201
(478) 745-2821
*Counsel for Defendant-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2023, I electronically filed the foregoing Appellee's Brief with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, which will serve all counsel of record. Additionally, on this same date, I have dispatched four paper copies of the foregoing Appellee's Brief with a third-party commercial carrier for delivery to the Clerk of Court.

*/s/ Callie D. Bryan*
Callie D. Bryan
Ga. Bar. No. 221194
William B. McDavid, Jr.
Ga. Bar. No. 315114
JONES CORK, LLP
435 Second Street, Suite 500
Macon, GA 31201
(478) 745-2821
*Counsel for Defendant-Appellee*